## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MELVIN PELLER, Derivatively on Behalf of EXELON CORPORATION, | Case No. _____ |
| Plaintiff, | |
| v. | |
| ANTHONY K. ANDERSON, ANN C. BERZIN, LAURIE BRLAS, CHRISTOPHER M. CRANE, YVES C. de BALMANN, NICHOLAS DeBENEDICTIS, JAY DOHERTY, JOSEPH DOMINGUEZ, JOHN HOOKER, LINDA JOJO, JEANNE M. JONES, PAUL L. JOSKOW, ROBERT J. LAWLESS, MICHAEL J. MADIGAN, FIDEL MARQUEZ, MICHAEL F. McCLAIN, RICHARD W. MIES, EDWARD MOODY, JOSEPH NIGRO, JUAN OCHOA, ANNE PRAMAGGIORE, JOHN W. ROGERS, JR., MAYO A. SHATTUCK III, STEPHEN D. STEINOUR, JOHN F. YOUNG, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| -and- | |
| EXELON CORPORATION, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Melvin Peller ("Plaintiff"), by and through his attorneys, respectfully submits this Verified Shareholder Derivative Complaint for the benefit of Nominal Defendant Exelon Corporation ("Exelon" or the "Company"), (1) against certain members of the Board of Directors for Exelon and of its majority-owned subsidiary, Commonwealth Edison Company ("ComEd"); (2) against certain executive officers of Exelon and of its majority-owned subsidiary, ComEd; and (3) against

certain third parties. Plaintiff seeks to remedy the Individual Defendants' (as defined herein) breaches of fiduciary duties through lack of oversight over corruption issues, condoning or engaging in bribery, and misleading statements made in the Company's proxy filings.

Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief based on the investigation of undersigned counsel. This investigation includes, but is not limited to, review and analysis of: (1) regulatory filings made by the Exelon with the United States Securities and Exchange Commission ("SEC"); (2) a deferred prosecution agreement (the "Agreement"), along with attachments, entered among the United States Attorney for the Northern District of Illinois, Exelon, and ComEd; (3) a securities class action lawsuit filed in the United States District Court for the Northern District of Illinois, entitled *Flynn v. Exelon Corporation*, Case No. 19-cv-08029 (N.D. Ill.), alleging violations of the federal securities laws based on similar facts and circumstances as alleged herein; (4) guilty verdicts and guilty pleas for certain individuals involved; (5) other related legal proceedings; (6) press releases, public letters, and other publications disseminated by Exelon, the SEC, and other non-parties; and (5) other publicly available information, including media and analyst reports, concerning Exelon.

## I.   PRELIMINARY STATEMENT

1.      This is a shareholder derivative action on behalf of Nominal Defendant Exelon, brought pursuant to 231 Pa. Code § 1506.

2.      Exelon is a utility services holding company that engages in the energy generation and delivery businesses in the United States and Canada.

3.      Exelon is the majority owner of ComEd, which is the largest electric utility in Illinois and the sole electric provider for much of Northern Illinois. Historically, Exelon Corporation has exerted substantial control through Exelon Utilities. For instance, ComEd is

subject to Exelon's Code of Conduct; shares its headquarters with Exelon; and Exelon's authority to enter binding agreements like the Agreement.

4.      As a utility, ComEd is subject to extensive regulation by the State of Illinois.  For example, the State of Illinois regulates the rates that ComEd may charge its customers, as well as the rate of return ComEd may realize from its business operations.

5.      This regulatory framework makes the utility industry particularly susceptible to legislative whims.

6.      As described in more detail below, Exelon—by and through ComEd—engaged in an almost-decade-long bribery scheme to get legislative favors from Illinois House of Representatives Speaker Michael J. Madigan ("Madigan") in exchange for his support for favorable legislation such as the 2011 Energy Infrastructure and Modernization Act ("EIMA") and the 2016 Future Energy Jobs Act ("FEJA").

7.      The bribery was pervasive and took numerous forms, including funneling payments to Madigan's cronies through a consulting firm under the guise of paying subcontractors; repeatedly prioritizing plumb contracts with a law firm owned by Madigan's friend that guaranteed a minimum number of hours; holding spots in an internship program for Madigan applicants; and pushing for Madigan's friend to be appointed to the Board of Directors without conducting an independent hiring process that would consider other candidates.

8.      In 2020, Exelon's Board of Directors (the "Board") granted authority for ComEd to enter into the Agreement related to the bribery scheme.  As described in more detail below, ComEd entered into this Agreement, admitting to bribery.

9.      Specifically, on July 17, 2020, the United States Attorney for the Northern District of Illinois, John R. Lausch, Jr., announced and filed in federal court the Agreement with ComEd.

Under the Agreement, "ComEd admitted it arranged jobs, vendor contracts, and monetary payments associated with those jobs and subcontracts, for various associates of a high-level elected official for the state of Illinois, to influence and reward the official's efforts to assist ComEd with respect to legislation concerning ComEd and its business."[1]

10.     ComEd, with the approval of Exelon's Board, also agreed to pay a $200 million criminal penalty[2] and to implement a set of corporate governance reforms.[3] ComEd agreed that it would continue its compliance and ethics program.[4]

11.     On May 2, 2023, four former members of ComEd's leadership and consulting teams were found guilty of bribery at trial[5] and another one has pleaded guilty.[6]

12.     The fallout from these illegal actions has resulted in numerous harms to Exelon, ComEd, and their shareholders. ComEd, Exelon, and their directors and officers are currently facing numerous consumer and shareholder lawsuits, creating risk and legal costs. Pursuant to the

---

[1] Press Release, United States Attorney's Office, Northern District of Illinois, "Commonwealth Edison Agrees to Pay $200 Million to Resolve Federal Criminal Investigation Into Bribery Scheme (July 17, 2020), https://www.justice.gov.ov/usao-ndil/pr/commonwealth-edison-agrees-pay-200-million-resolve-federal-criminal-investigation.

[2] Press Release, United States Attorney's Office, Northern District of Illinois, "Commonwealth Edison Agrees to Pay $200 Million to Resolve Federal Criminal Investigation Into Bribery Scheme (July 17, 2020), https://www.justice.gov.ov/usao-ndil/pr/commonwealth-edison-agrees-pay-200-million-resolve-federal-criminal-investigation.

[3] Deferred Prosecution Agreement, https://www.justice.gov/d9/press-releases/attachments/2020/07/17/comed_dpa_and_attachments_executed_0.pdf, at pp. 6–8.

[4] Deferred Prosecution Agreement, https://www.justice.gov/d9/press-releases/attachments/2020/07/17/comed_dpa_and_attachments_executed_0.pdf, at pp. 9–10.

[5] Jay Doherty, ComEd's Executive Vice President of Legislative and external affairs from 2009 to 2012 and external lobbyist for ComEd after 2012 (convicted of conspiracy, bribery, and record falsification); John Hooker, ComEd's executive vice president of legislative and external affairs from 2009 to 2012, external lobbyist for ComEd from 2012 until 2019 (convicted of conspiracy, bribery, and record falsification); Michael F. McClain, a former-state-lawmaker-turned-ComEd-consultant-and-lobbyist (convicted of conspiracy, bribery, and record falsification); Anne Pramaggiore, ComEd's former Chief Executive Officer ("CEO") and an executive at Exelon Utilities (convicted of conspiracy, bribery, and record falsification at trial).

[6] Fidel Marquez, ComEd's former Senior Vice President of Governmental and External Affairs from 2012 to 2019 (pleaded guilty).

Agreement, ComEd paid a $200 criminal penalty and a criminal fine for its conduct. And, due to the actions of Exelon and ComEd's officers and directors, the companies' reputations have been irreparably harmed as a result of the media frenzy surrounding this scandal. Exelon and ComEd have spent a significant amount of money responding to government entities and investigations. And finally, pursuant to the Agreement, Exelon and ComEd have incurred, and will continue to incur, remediation, compliance, and reporting costs.

13.     On November 2, 2020, Plaintiff sent a litigation demand letter to the Board of Exelon demanding the Exelon Board take action against the officers and directors, as well as other individuals, who participated in the fraudulent scheme to recover the damages described in the demand letter for the benefit of Exelon, including but not limited to, the cost of defending any possible claims and to correct the deficiencies in Exelon's controls that allowed the misconduct to occur. (Exhibit A)

14.     On April 5, 2021, counsel at Dechert LLP responded to Plaintiff's demand letter stating that "a Special Litigation Committee (the "Committee") has been formed pursuant to 15 Pa. C.S.A. § 1783. The members of the Committee include Virginia Fogg, Michele Coleman Mayes and Janet Langford Carrig," and counsel at Dechert LLP was retained to assist with the Committee's investigation. (Exhibit B)

15.     The wrongful acts complained of have harmed, continue to harm, and will continue to harm Exelon because the adverse consequences of the actions are still in effect and ongoing, including the continued need to pay for remedial actions promised in the Agreement, continued reputational harm, etc.

16.     Plaintiff is not the only shareholder to send a demand letter. Several other shareholders also sent letters to the Exelon Board since 2020 demanding, among other things, that

the Exelon Board investigate and address the alleged breaches of fiduciary duties and other alleged violations by Exelon and ComEd officers and directors related to the conduct described in the Agreement.

17.     Plaintiff and the other parties participated in a mediation in February 2023.

18.     Several lawsuits have already been filed against current and former Exelon and ComEd officers and directors, and certain third parties, and against Exelon as nominal defendant, asserting claims similar to those made in their respective demand letters.

19.     The lawsuits challenged the Board's continued refusal to bring litigation in response to the demands.

20.     On May 26, 2023, counsel at Dechert LLP advised Plaintiff for the first time that the Committee reached a determination, and that defendants and certain other shareholders who also participated in the mediation (the "Settling Shareholders") purported to have reached a settlement resolving all derivative claims involved in this matter.

21.     Also at the same time, an action was filed in this Court by the Settling Shareholders.

22.     Plaintiff only learned of this proposed settlement when the Committee filed its Notice of Determination and Intent to Seek Court Approval of Settlement on May 26, 2023.

23.     No one—not the Board, not the Committee and not the Settling Shareholders— notified Plaintiff of the purported settlement or its terms before filing it with the Court.

24.     The wrongful acts complained of have harmed, continue to harm, and will continue to harm Exelon because the adverse consequences of the actions are still in effect and ongoing, including continued need to pay for remedial actions promised in the Agreement, continued reputational harm, etc.

## II.   PARTIES

### A.   PLAINTIFF

25.   Melvin Peller ("Plaintiff") is an Exelon shareholder and has continuously held Exelon stock since at least 2013.  Plaintiff will fairly and adequately represent Exelon's interests in this action.

### B.   NOMINAL DEFENDANT

26.   Nominal Defendant Exelon is a citizen of Pennsylvania and Illinois because it is incorporated in Pennsylvania and headquartered at 10 South Dearborn Street, Chicago, Illinois, 60680.  Exelon shares a headquarters with its subsidiary, ComEd.  Exelon is a regulated electric utility.  It is a utility services holding company and the largest energy delivery company in the United States.  Exelon engages in energy generation, delivery, and marketing through its subsidiaries, including ComEd.  Exelon supplies electricity in Illinois as well as other states through its subsidiary, ComEd.  ComEd is the largest electric utility in Illinois and the sole electric provider for much of Northern Illinois.  ComEd purchases, regulates, transmits, and distributes electricity to retail customers throughout northern Illinois.  Because the electric utility business is a highly-regulated industry, Exelon and ComEd's profits depend in large part on favorable legislation and regulations.

### C.   EXELON AND COMED DIRECTOR & OFFICER DEFENDANTS

27.   Anthony K. Anderson ("Anderson") has been a ComEd Board Director since January 2013.

28.   Ann C. Berzin ("Berzin") was an Exelon Board Director from 2012 to 2023. During her tenure, she served in two leadership roles, first as Chair of Exelon's Risk Committee and then as Chair of the Audit and Risk Committee.  At the time she chose not to stand for re-election, she was the Chair of the Audit and Risk Committee.

29.     Laurie Brlas ("Brlas") was an Exelon Board Director from 2018 to 2022.

30.     Christopher M. Crane ("Crane") was the CEO and a member of the Board of Exelon from 2012 to 2022.

31.     Yves C. de Balmann ("de Balmann") was an Exelon Board Director from 2012 to 2022.

32.     Nicholas DeBenedictis ("DeBenedictis") was an Exelon Board Director from 2002 to 2021 and served as a ComEd Board Director starting in 2013.

33.     Joseph Dominguez ("Dominguez") was the CEO of ComEd from 2018 to early 2023. He also served as Executive Vice President, Governmental & Regulatory Affairs and Public Policy of Exelon since 2015, and Senior Vice President, Governmental & Regulatory Affairs and Public Policy of Exelon since 2012.

34.     John Hooker ("Hooker"), served as ComEd's Executive Vice President of Legislative and External Affairs from 2009 to 2012. Then, from 2012 until 2019, he worked as an external lobbyist for ComEd. For the purposes of Hooker's leadership role at ComEd from 2009 to 2012, he is considered an "officer or director defendant." For the purposes of his role as a lobbyist after that time, he is considered a third-party defendant. A federal jury found Hooker guilty of all charges for his role in the bribery scandal.[7]

35.     Linda Jojo ("Jojo") has been an Exelon Board Director since September 2015.

36.     Jeanne M. Jones ("Jones") has been the Executive Vice President and Chief Financial Officer ("CFO") of Exelon since October 2022. Prior to that, she served in the role of Senior Vice President Exelon Corporate Finance, Investor Relations and Treasury from November

---

7  United States Attorney's Office Northern District of Illinois Press Release, "Former Commonwealth Edison Executives and Associates Found Guilty of Conspiring To Influence and Reward Former Illinois House Speaker," May 2, 2023, https://www.justice.gov/usao-ndil/pr/former-commonwealth-edison-executives-and-associates-found-guilty-conspiring-influence.

2021 to October 2022. Prior to that, she was the Senior Vice President, CFO, and Treasurer of ComEd from June 2018 to November 2021.

37. Paul L. Joskow ("Joskow") was an Exelon Board Director from 2007 to 2023.

38. Robert J. Lawless ("Lawless") was an Exelon Board Director from 2012 to 2022.

39. Fidel Marquez ("Marquez") was ComEd's Senior Vice President for Legislative and External Affairs from in or around March 2012 to in or around September 2019. He was a ComEd employee for nearly 40 years. He pleaded guilty to his role in the bribery scheme and has turned state witness. Marquez pleaded guilty to bribery charges in September 2020.

40. Adm. (Ret.) Richard W. Mies ("Mies") was an Exelon Board Director from 2009 to 2020.

41. Joseph Nigro ("Nigro") was the Exelon CFO from 2018 to 2022.

42. Juan Ochoa ("Ochoa") was a Board member of ComEd from 2018 to April 2020. Ochoa was appointed at the behest of Madigan through McClain, who directed a campaign to have Ochoa appointed to the Board to reward him for his political loyalty.

43. Anne Pramaggiore was the CEO of ComEd from 2012 to 2018, and then served as a senior executive at Exelon Utilities from 2018 to October 2019, when she abruptly resigned during the ComEd-Madigan bribery investigation. A federal jury found Pramaggiore guilty of all charges for her role in the bribery scandal.[8]

44. John W. Rogers, Jr., ("Rogers") was an Exelon Board Director from 2000 to 2019.

---

[8] United States Attorney's Office Northern District of Illinois Press Release, "Former Commonwealth Edison Executives and Associates Found Guilty of Conspiring To Influence and Reward Former Illinois House Speaker," May 2, 2023, https://www.justice.gov/usao-ndil/pr/former-commonwealth-edison-executives-and-associates-found-guilty-conspiring-influence.

45.     Mayo A. Shattuck III ("Shattuck") was the Chair of the Exelon Board from 2012 to 2022.  He was the chair of the Oversight Committee that oversaw the Company's response to the federal bribery investigation.

46.     Stephen D. Steinour ("Steinour") was an Exelon Board Director from 2007 until April 2020.

47.     John F. Young ("Young") has been a Director at Exelon since July 2018 and Chair of the Board since 2022.  From 2003 to 2008, he also served in a number of senior leadership positions at Exelon and Exelon Generation.

48.     Anderson, Berzin; Brlas, Crane, de Balmann, DeBenedictis, Dominguez, Hooker, Jojo, Jones, Joskow, Lawless, Marquez, Mies, Nigro, Ochoa, Pramaggiore, Rogers, Shattuck, Steinour, Young, are collectively referred to as "Fiduciary Defendants."

**D.     THIRD-PARTY DEFENDANTS**

49.     Jay Doherty ("Doherty") was a consultant for ComEd.  Doherty used his consulting firm to white-wash payments to Madigan's allies by hiring them and styling them as subcontractors at his consulting firm.  A federal jury found Doherty guilty of all charges for his role in the bribery scandal.[9]

50.     Michael J. Madigan was the Speaker of the Illinois House of Representatives for 36 years—first from 1983 to 1995 and then from 1997 to 2021.  Madigan induced ComEd to hire his friends and allies—even though they offered no or little value to ComEd—at total costs exceeding $1.3 million.  Madigan also solicited campaign contributions from ComEd and Exelon

---

[9] United States Attorney's Office Northern District of Illinois Press Release, "Former Commonwealth Edison Executives and Associates Found Guilty of Conspiring To Influence and Reward Former Illinois House Speaker," May 2, 2023, https://www.justice.gov/usao-ndil/pr/former-commonwealth-edison-executives-and-associates-found-guilty-conspiring-influence.

that totaled hundreds of thousands of dollars per year, in exchange for his support for favorable legislation.

51.     Michael F. McClain ("McClain") was a former state lawmaker who had served in the Illinois House of Representatives alongside Madigan from 1972 until he was defeated in his re-election bid in 1982.  He had a close personal relationship with Madigan.  After McClain's election defeat, he served as a ComEd contract lobbyist on a regular retainer until he formally retired in 2016.  After that, he continued to consult and lobby for ComEd for substantial sums of money.  In 2018 alone, he was paid $211,000 by ComEd.  A federal jury found Doherty guilty of all charges for his role in the bribery scandal.[10]

52.     Edward Moody ("Moody") was Madigan's precinct co-captain for his home base, the 13th Ward of Chicago.  He has admitted to securing contracts paid by ComEd that have earned him more than $350,000 in total for no-to-little work.

53.     Doherty, Hooker, Madigan, McClain, and Moody are collectively referred to as "Third-Party Defendants."

54.     Fiduciary Defendants and Third-Party Defendants are collectively referred to as the Individual Defendants.

### III.     JURISDICTION AND VENUE

55.     This Court has jurisdiction under 28 U.S.C. § 1331.  The claims asserted herein arise under § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (shareholder approval of executive compensation; 15 U.S.C. § 78n(a) (solicitation of proxies in violation of rules and regulations); and Rule 14a-9, 17 C.F.R. § 240.14a-9 (false or misleading statements),

---

[10]  United States Attorney's Office Northern District of Illinois Press Release, "Former Commonwealth Edison Executives and Associates Found Guilty of Conspiring To Influence and Reward Former Illinois House Speaker," May 2, 2023, https://www.justice.gov/usao-ndil/pr/former-commonwealth-edison-executives-and-associates-found-guilty-conspiring-influence.

11

promulgated thereunder.  Jurisdiction also arises pursuant to the validity of contracts provisions governing violation of these rules (§ 29(b) of the Exchange Act and 15 U.S.C. § 78cc(b) (validity of contracts)).

56.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as to the state law claims alleged, as they arise out of the same transactions and occurrences as the federal claims.

57.     This Court has personal jurisdiction over each defendant named herein because each defendant is an individual or corporation that has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

58.     In addition, Nominal Defendant Exelon is incorporated in Pennsylvania but headquartered in, maintains its principal executive offices in, and conducts business within, this District, through which the Individual Defendants had continuous and systemic contacts within this District.

59.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391(b)(1) as to Exelon—which resides in and maintains its principal place of business in this District.  Venue is also proper in this Court in accordance with 28 U.S.C. § 1391(b)(2) because a substantial portion of the transactions and wrongs complained of herein, including the Fiduciary and Third-Party Defendants' primary participation in the wrongful acts detailed herein, occurred in this District. The Fiduciary and Third-Party Defendants have engaged in numerous activities that have had an effect in this District.

## IV.    STATEMENT OF FACTS COMMON TO ALL CLAIMS

### A.    COMED BRIBED MADIGAN
### IN EXCHANGE FOR LEGISLATIVE FAVORS

60.    Madigan served as the Speaker of Illinois's House of Representatives for almost thirty years (from 1983 to 2021, except from 1995 to 1997).  Known as the "Velvet Hammer" for his soft-spoken manner and his formidable political power, he was the longest serving member of the Illinois House of Representatives.  During his reign, he demanded loyalty and favors from those around him and wielded his political power to dispense favors through a web of political patronage.

61.    Madigan was a master of using his power to obtain "jobs" for his political allies and supporters.  Although such favors were couched as legitimate business and hiring decisions, in reality the positions often required the designees to do little—if any—work.  Instead, the purported jobs served as legitimizing cover for payouts to Madigan loyalists.

62.    Beginning around 2011, Madigan and McClain—a former state lawmaker turned lobbyist and Madigan's friend and confidante—sought to obtain jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts from ComEd for various associates of Madigan, such as interns and precinct captains who operated within Madigan's legislative district.

63.    McClain served as the primary conduit between ComEd and Madigan and had regular conversations both with Madigan and Pramaggiore.  In fact, his role as an "in" to Madigan was so well-known that Pramaggiore told him that McClain's electoral loss, which freed him up to be a lobbyist, had "saved" ComEd—since without it ComEd would not have had McClain's help in pushing through favorable legislation.  These legislative wins included EIMA and FEJA, laws that played a key role in bringing ComEd back from the brink of bankruptcy.  ComEd

employees called McClain a "double agent" because of his central role in the scheme, since he transmitted ComEd's needs to Madigan and vice versa.

64.     This Madigan–ComEd relationship made ComEd one of the main and most well-established players in Madigan's patronage network.  ComEd understood that, as Speaker of the House of Representatives, Madigan was able to exercise control over what measures were called for a vote in the House of Representatives and that he had substantial influence and control over fellow lawmakers concerning legislation that affected ComEd.  In fact, on one phone call, McClain claimed that ComEd had been part of the "old-fashioned patronage system" and had been currying favor with political officials for decades by hiring political favorites.

65.     For almost a decade—from approximately 2011 to 2019 ("the Bribery Era")—in an effort to influence and reward Madigan's efforts as Speaker of the Illinois House of Representatives and to assist ComEd with respect to legislation concerning ComEd and its business, ComEd participated in a patronage system designed to elicit legislative favors from Madigan in exchange for funneling jobs and money to Madigan's political allies and cronies.  As explained in more detail below, ComEd provided Madigan's political allies and cronies with jobs, vendor subcontracts, and monetary payments—even in instances where these individuals performed little or no work in the roles they were purportedly being hired to perform.

66.     During this period, Pramaggiore, Hooker, Doherty, and McClain—known as the "ComEd Four"—were the nexus of ComEd executives, lobbyists, and consultants behind the bribery scheme.

67.     As described in more detail below, ComEd's bribery took many forms, including: (1) laundering payments to Madigan's associates by funneling the money through Doherty's consulting firm under the guise of paying subcontractors; (2) prioritizing plumb contracts with

Reyes Kurson Ltd., a law firm, including guaranteeing the firm 850 hours of work even though they did not need it, all to keep Madigan happy; (3) setting aside applicant spots in ComEd's purportedly competitive internship program for Madigan's preferred applicants; and (4) pressing for a board member to be appointed based on the candidate's relationship with Madigan, instead of based on finding the best director for the company. Most of these started early in the Bribery Era and continued until near the end of the Bribery Era; however, some (like trying to have Madigan's man appointed to the Board) occurred near the end of the Bribery Era.

68.     For instance, in 2011, McClain and Hooker—who served as ComEd's executive vice president of legislative and external affairs between 2009 and 2012 and as an external lobbyist for ComEd between 2012 and 2019—hatched the plan to direct money to two of Madigan's associates by having ComEd pay them indirectly as subcontractors to ComEd's consultant Doherty.

69.     Doherty agreed that Madigan's associates would be identified as subcontractors under Doherty's contract and that ComEd's payments to Doherty would be increased to cover payments to those subcontractors.

70.     Between 2011 and 2019, Doherty executed written contracts and submitted invoices to ComEd that made it falsely appear that the payments made to Jay D. Doherty & Associates ("JDDA"), Doherty's consulting firm, were all in return for Doherty's advice on "legislative issues," "legislative risk management activities," and other similar matters, when in fact a portion of the compensation paid to was intended for ultimate payment to Madigan's associates, who in fact did little or no work for ComEd or JDDA.

71.     Doherty and JDDA did little, if anything, to direct or supervise the activities of Madigan's associates on their payroll, even though these associates were subcontracted under and

received payments through JDDA. Moreover, because they were paid indirectly through JDDA, the payments to Madigan's associates over the course of approximately eight years were not reflected in the vendor payment system used by ComEd. As a result, despite the fact that Madigan's associates were subcontracted under and receiving payments through JDDA, no such payments were identifiable in ComEd's vendor payment system.

72.     JDDA's payments to Madigan's associates, as well as later payments to other subcontracted associates of Madigan, continued until in or around 2019, even though those associates did little or no work during that period.

73.     Certain senior executives and agents of ComEd were aware of these payments from their inception until they were discontinued in or around 2019. For example, in or around May 2018, Madigan, through McClain, asked Pramaggiore—who served as the CEO of ComEd between through May 2018—to hire a political ally of Madigan's who was retiring from the Chicago City Council at the end of the month.

74.     Pramaggiore, in coordination with Doherty and Marquez—who served as ComEd's Senior Vice President for Legislative and External Affairs from in or around March 2012 until in or around September 2019—agreed that ComEd would pay Madigan's political ally approximately $5,000 a month indirectly as a subcontractor.

75.     At the time that Pramaggiore approved this arrangement, Pramaggiore was aware that there were other associates of Madigan's that were paid indirectly as subcontractors through JDDA. Pramaggiore referred to this list of associates as the "roster."

76.     Pramaggiore also agreed that Madigan—rather than an officer or employee of ComEd or JDDA—would advise his political ally of this new arrangement. In or around June 2018, JDDA's contract was revised to include extra funding for the purpose of paying Madigan's

political ally. In an attempt to justify the extra funding, Doherty claimed falsely that an additional fee of $5,000 a month was necessary under the contract, in part because of JDDA's "expanded role with Cook County Board president's office and Cook County Commissioners and Department Heads," when in fact the additional $5,000 a month in compensation was intended for payment to Madigan's political ally.

77.     ComEd approved of the additional payments to JDDA, knowing they were intended for Madigan's political ally. Certain senior executives and agents of ComEd were also aware of the purpose of these payments to Madigan's associates, namely, that they were intended to influence and reward Madigan in connection with Madigan's official duties and to advance ComEd's business interests. Numerous conversations show that senior executives and agents ComEd were aware of the nature of this arrangement and the fact that what they were doing was wrong:

- On May 16, 2018, McClain explained to Marquez why certain individuals were being paid indirectly through JDDA, by referencing their utility to Madigan's political operation. McClain identified one of Madigan's associates, one of the several individuals on JDDA's payroll, as "one of the top three precinct captains" who also "trains people how to go door to door . . . so just to give you an idea how important the guy is."

- Further, on February 7, 2019, McClain advised Marquez about how to present information within ComEd concerning the renewal of JDDA's contract for 2019. In the conversation, McClain advised Marquez that, "I would say to you don't put anything in writing," explaining later in the conversation because "all it can do is hurt ya." McClain further advised Marquez that, if asked by a ComEd official why JDDA was being paid, Marquez should explain that the associates of Madigan were former ward committeemen and aldermen, that it was a

"favor," and that it would be up to Doherty to prove that Madigan's associates performed work, not ComEd.

- On February 11, 2019, McClain had a conversation with Hooker, who by that time had retired from ComEd, but had continued to serve as a paid external lobbyist to ComEd. In discussing how the renewal of JDDA's contract—which included significant payments to JDDA to account for indirect payments to Madigan's associates—should be communicated internally, McClain said, "We had to hire these guys because [Madigan] came to us. It's just that simple." Hooker agreed, and added, "It's, it's clean for all of us."

- Doherty advised Marquez that Madigan's two associates had been made "subcontractors" of JDDA at Hooker's request, and that Madigan's political ally was also currently being paid as a "subcontractor." At one point on February 13, 2019, while Marquez (who had turned State's witness) was wearing a wire, he asked Doherty about the value of these arrangements for ComEd. Doherty replied: "if it ain't broke, don't fix it." Doherty emphasized that he had told no one of the arrangement per instructions previously given to Doherty, and cautioned Marquez that ComEd should not tamper with the arrangement because "your money comes from Springfield," and that Doherty had "every reason to believe" that McClain had spoken to Madigan about the retention of Madigan's associates and knew Hooker had done so. Doherty added that Madigan's associates "keep their mouth shut, and, you know, so. But, do they do anything for me on a day to day basis? No." Doherty explained that these payments were made "to keep [Madigan] happy, I think it's worth it, because you'd hear otherwise."

- On March 5, 2019, McClain and ComEd personnel participated in a meeting during which they discussed JDDA's contract and why the indirect payments to Madigan's associates made under the guise of that contract should be continued for another year. During that meeting,

McClain explained that for decades, Madigan had named individuals to be ComEd employees, such as meter readers, as part of an "old-fashioned patronage system." In response, a ComEd employee acknowledged that such hires could be a "chip" used by ComEd. ComEd renewed JDDA's contract.

- On or about March 6, 2019, McClain and Hooker discussed the renewal of JDDA's contract. During the conversation, Hooker explained that "with the [Doherty] stuff, you got a little leg up," to which McClain agreed. Hooker later added, "I mean it's uh, unmentioned, but you know, that which is understood need not be mentioned." McClain responded, "Right. Exactly. Exactly."

78.     A similar but distinct scheme involved a second company, this time a law firm called Reyes Kurson Ltd ("Reyes Kurson"). This bribery scheme also started in 2011 and involved ComEd creating a contract guaranteeing the firm 850 hours of work, regardless of ComEd's actual legal needs, to keep Madigan happy.

79.     Specifically, in 2011, ComEd agreed to retain Reyes Kurson—a law firm co-founded by Madigan's friend, Victor Reyes. ComEd contracted to provide Reyes Kurson with a minimum of 850 hours of attorney work per year—even though ComEd did not need 850 hours' worth of legal work. This contract was in addition to a consulting contract Reyes already had with ComEd for the Roosevelt Group; this fact led Thomas O'Neill ("O'Neill")—Exelon's Senior Vice President from January 1, 2017 to 2020 and Exelon and ComEd's chief legal officer—to think Reyes was "double dipping." The 850-hour contract was inked, in part, to influence and reward Madigan in connection with his legislative duties.

80.     ComEd leadership understood that giving this contract to Reyes Kurson was important to Madigan because of Madigan's personal relationship with Reyes, the co-founder of Reyes Kurson.  Reyes was valuable to Madigan.

81.     In 2016, when the Reyes Kurson contract was up for renewal, there was talk of ComEd reducing the number of hours guaranteed to the firm.  As a result, Pramaggiore and McClain had a frank discussion in which McClain indicated to Pramaggiore that Reyes Kurson was very valuable to their "Friend" [Madigan] and that if Pramaggiore did not resolve the contract issue, McClain would go to their "Friend" [Madigan].   When discussing bribery involving Madigan, McClain often spoke in coded language and referred to Madigan as their "Friend."

82.     Pramaggiore replied in writing, "Sorry.  No one informed me.  I am on this."

83.     Thereafter, Pramaggiore tasked a ComEd employee, who was assigned as a "project manager" to assist with the project of obtaining legislative approval of Future Energy Jobs Act ("FEJA"), to ensure that the Reyes Kurson contract was renewed.

84.     The project manager had no oversight authority over ComEd's legal department and was not otherwise involved in deciding what legal professionals the legal department retained. The project manager was assigned the task of ensuring the Reyes Kurson contract was renewed because the work provided to Reyes Kurson was, in part, designed to influence and reward Madigan in connection with Madigan's official duties, including the promotion and passage of FEJA.

85.     McClain also pressured O'Neill to the point that O'Neill thought McClain was being a "pest."  O'Neill was relentlessly pressured to give direct legal work to Reyes Kurson pursuant to the contract which guaranteed Reyes Kurson a minimum number of 850 billable hours per year.  O'Neill understood that the primary reason for this guarantee was not based on ComEd's

legal needs, but instead because it was important to appease Madigan while ComEd was trying to get FEJA passed.

86.     ComEd agreed in or around June 2016 to renew Reyes Kurson's contract with substantially reduced annual hours.

87.     A third scheme started in approximately 2013 and involved ComEd setting aside applicant spots in ComEd's purportedly competitive internship program for Madigan's preferred applicants.

88.     Beginning no later than 2013, and continuing until in or around 2019, ComEd operated a large summer internship program for students.

89.     Each summer, ComEd hired approximately 100-150 interns.

90.     To be eligible, a candidate needed to be enrolled full-time in college or university, except for a few select high school students.  ComEd would recruit prospective interns on college campuses and would also receive referrals from public officials and others.

91.     However, generally speaking, even those referred had to compete with the general pool of interns.

92.     This was not the case with interns who primarily resided in a Chicago ward that Madigan was associated with, the 13th Ward.

93.     As part of the program, ComEd would set aside a specified target number of students who primarily resided in the 13th Ward or who were recommended to ComEd by Madigan associates.  This meant 13th Ward candidates did not need to compete with the general pool of candidates.

94.     At one point, the number of allocated spots was six to eight, but by 2015 or 2016, had risen to ten spots.

95.     These spots were Madigan's to fill because of his position as Speaker and his legislative importance to ComEd.

96.     The company was attempting to influence Madigan in his role as a public official. McClain referred 13th Ward interns to ComEd, and Marquez worked hard to ensure they were placed because Marquez did not want to risk Madigan forming a negative view of the company, which would impact ComEd's legislative goals.

97.     At times, ComEd through its agent, Marquez, was able to waive the minimum grade point average ("GPA") requirement for applicants from the 13th Ward, and often Marquez emphasized to other employees the sensitivity and need to hire 13th Ward interns.

98.     Sometimes wholly unqualified candidates were put forward; McClain pressed for one unqualified candidate to be given a position in the ComEd legal department—without being counted against the six (at that time) summer job slots designated for Madigan's allies.  McClain said of that unqualified candidate: "He will not learn very much, and he will not be able to contribute much, if anything, but that is still the ask."

99.     ComEd hired students from Madigan's 13th Ward, in part, with the intent to influence and reward Madigan in connection with Madigan's official duties, which could have impacted ComEd's legislative goals.

100.    Lastly, Pramaggiore and other implicated employees of ComEd also pushed for a board member, Ochoa, to be appointed based on his relationship with Madigan, instead of based on finding the best director for the company.

101.    Beginning in 2017, Madigan sought the appointment of Madigan's associate, Ochoa to the ComEd Board of Directors (the "ComEd Board").  Madigan's request was communicated by McClain to Pramaggiore.

102.     In fact, at the trial of the so-called "ComEd Four," O'Neill testified that Pramaggiore had received Ochoa's resume from Madigan's office in November 2017 but that O'Neill pushed back until he had done his due diligence and run a background check.  O'Neill also testified that he had concerns about someone from Madigan's staff serving on the ComEd Board, but added that Pramaggiore wanted the appointment to go forward.

103.     In May 2018, in response to internal company opposition to the appointment of Ochoa—especially O'Neill's optics concerns—Pramaggiore asked McClain if Madigan would be satisfied if Pramaggiore arranged for Ochoa to receive a part-time job that paid an equivalent amount of money to a board member position, namely, $78,000 a year.  Madigan dismissed these optics concerns in his communications with McClain.

104.     McClain told Pramaggiore that Madigan would appreciate if Pramaggiore would "keep pressing" for the appointment of Ochoa, and Pramaggiore agreed to do so.

105.     In September 2018, Pramaggiore (who by this time had been promoted to an executive position within Exelon Utilities, in which capacity Pramaggiore maintained oversight authority over ComEd) reassured McClain that Pramaggiore was continuing to advocate for the appointment of Ochoa made at Madigan's request because, "You take good care of me and so does our Friend [Madigan] and I will do the best that I can to, to take care of you."

106.     On April 25, 2019, Pramaggiore advised McClain by text message, "Just sent out Board approval to appoint [Ochoa] to ComEd Board."  The following day, April 26, 2019, ComEd filed a notice with the United States Securities and Exchange Commission stating that Ochoa had served as a director of ComEd since April 2019.  Thus—although it took more than a year—Pramaggiore ultimately succeeded in getting Ochoa appointed to the ComEd Board.

107.    Although ComEd and Exelon conducted due diligence on Ochoa after pressure from O'Neill and ultimately determined he was qualified for a ComEd Board position, no one at ComEd or Exelon recruited Ochoa to serve as a director, and ComEd did not interview or vet other outside candidates for the vacant board seat, meaning that there was no determination that Ochoa was the best candidate for ComEd.  ComEd appointed Ochoa, in part, with the intent to influence and reward Madigan in connection with Madigan's official duties.

108.    As these examples show, over these years, ComEd repeatedly bribed Madigan. ComEd executives bribed Madigan by wasting corporate resources on hires and retentions of individuals and businesses to please Madigan in exchange for favorable legislative treatment. These payment schemes to Madigan associates—who performed little or no work for ComEd— cost ComEd approximately $1,324,500.

109.    The ComEd Four were indicted in November 2020 and were found guilty at their criminal bribery trial in May 2023.

110.    In addition to the bribes carried out by Exelon's subsidiary, ComEd—a division of Exelon Utilities—Exelon Generation exerted oversight control over ComEd—also engaged in currying favor with Madigan.[11]

111.    For instance, in one call McClain told Marquez that in talking to the "speaker," he brought up bills where "Exelon Generation wants to do something" and needed to know who was the "point person" to talk to and who would "drive the bus" on those matters.

112.    McClain explained that the point person would preferably be a contract lobbyist (not an Exelon or ComEd employee) who was "discrete" and who would speak in "code."

---

[11]  On February 24, 2021, Exelon announced that it had approved a plan to separate Exelon Utilities, which included ComEd, and Exelon Generation (its power-generation division) into two separate publicly traded companies.

Ultimately, Pramaggiore (then-Exelon Utilities CEO) recommended either Hooker or McClain because they were "seasoned."

**B.     EXELON AND COMED ADMIT TO FAULT
        AND ENTER INTO A DEFERRED PROSECUTION AGREEMENT**

113.    On July 16, 2020, Exelon and ComEd entered into the Agreement.  As a result, ComEd agreed to pay a $200 million fine for a long-running bribery scheme in which the utility company gave jobs and contracts to associates of Illinois House Speaker Michael Madigan.  Under the Agreement, the Illinois utility company must continue to cooperate with the investigation until it is complete.  ComEd is responsible for paying $100,000,000 to the United States Treasury within thirty days of the filing of the Agreement and the remaining $100,000,000 within ninety days of the filing of the Agreement.

114.    In connection with the Agreement, the United States Attorney for the Northern District of Illinois published the following press release[12] which stated:

> Commonwealth Edison Company ("ComEd"), the largest electric utility in Illinois, has agreed to pay $200 million to resolve a federal criminal investigation into a years-long bribery scheme, the U.S. Attorney's Office in Chicago announced today.
>
> The criminal investigation of ComEd is being resolved with a deferred prosecution agreement under which ComEd admitted it arranged jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts, for various associates of a high-level elected official for the state of Illinois, to influence and reward the official's efforts to assist ComEd with respect to legislation concerning ComEd and its business.  The U.S. Attorney's Office today filed a one-count criminal information in U.S. District Court in Chicago charging ComEd with bribery.   Under the agreement, the government will defer prosecution on the charge for three years and then seek to dismiss it if ComEd abides by certain conditions, including continuing to cooperate with ongoing investigations of individuals or other entities related to the conduct described in the bribery charge.

---

[12]   United States Attorney's Office Northern District of Illinois Press Release, "Commonwealth Edison Agrees to Pay $200 Million to Resolve Federal Criminal Investigation Into Bribery Scheme," July 17, 2020, https://www.justice.gov/usao-ndil/pr/commonwealth-edison-agrees-pay-200-million-resolve-federal-criminal-investigation.

The deferred prosecution agreement, which is subject to approval by the U.S. District Court, requires ComEd to pay a $200 million fine. A court date for the approval hearing has not yet been scheduled.

The bribery charge and deferred prosecution agreement were announced by John R. Lausch, Jr., United States Attorney for the Northern District of Illinois; Emmerson Buie, Jr., Special Agent-in-Charge of the Chicago office of the FBI; and Kathy A. Enstrom, Special Agent-in-Charge of the IRS Criminal Investigation Division in Chicago. The government is represented by Assistant U.S. Attorneys Amarjeet S. Bhachu, Diane MacArthur, Timothy J. Chapman, Sarah E. Streicker, Matthew L. Kutcher, and Michelle Kramer.

In addition to the monetary penalty and obligation to continue cooperating with government investigations, ComEd's obligations under the deferred prosecution agreement include enhancing its compliance program and providing annual reports to the government regarding remediation and implementation of its compliance measures. If ComEd fails to completely perform or fulfill each of its obligations under the agreement during the three-year term, the U.S. Attorney's Office can initiate prosecution of the charged offense.

ComEd's admissions regarding the charged conduct are contained in a Statement of Facts attached to the deferred prosecution agreement. ComEd admitted that its efforts to influence and reward the high-level elected official – identified in the Statement of Facts as "Public Official A" – began in or around 2011 and continued through in or around 2019. During that time, the Illinois General Assembly considered bills and passed legislation that had a substantial impact on ComEd's operations and profitability, including legislation that affected the regulatory process used to determine the electricity rates ComEd charged its customers. [Madigan] controlled what measures were called for a vote in the Illinois House of Representatives and exerted substantial influence over fellow lawmakers concerning legislation affecting ComEd. The company admitted that it arranged for jobs and vendor subcontracts for [Madigan's] political allies and workers even in instances where those people performed little or no work that they were purportedly hired by ComEd to perform.

In addition to the jobs and contracts, ComEd further admitted that it undertook other efforts to influence and reward [Madigan,] including by appointing an individual to ComEd's Board of Directors at the request of [Madigan]; retaining a particular [Reyes Kurson Ltd., a law firm] at the request of [Madigan]; and accepting into the company's internship program a certain amount of students who resided in the Chicago ward where [Madigan] was associated.

115.     Although—as the Agreement notes—Exelon & ComEd's Code of Conduct ("the Code") requires employees to keep accurate and complete payment records, among other such

controls, and although the Code specifically prohibits bribery, these controls all failed—allowing ComEd executives to get away with improper payments and bribes, including payments that resulted in little-to-no work being performed for ComEd, for almost a decade.

116. The Agreement also requires ComEd to develop and promulgate certain basic policies—suggesting that these very policies did not exist prior to the Agreement requiring them. Two examples are:

- "ComEd will develop and promulgate a clearly articulated and visible corporate policy against violations of U.S. law, which policy shall be memorialized in a written compliance code."

- "ComEd will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of U.S. law and ComEd's compliance code, and ComEd will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of U.S. law by personnel at all levels of ComEd…."

117. These are basic functions of the Board, and the Board's failure to have such policies in place is indicative of a breach of fiduciary duty and failure of oversight.

### C. THE TRIAL OF THE "COMED FOUR"

118. On May 3, 2023, Doherty, Hooker, Pramaggiore, and McClain were found guilty of bribery and associated crimes at trial.

119. Key evidence in the trial included secretly-recorded conversations among these individuals and others.

120. For instance, during a phone call on May 8, 2018, Pramaggiore—then-CEO of ComEd—reported to McClain (who was purportedly only a consultant for ComEd) that she needed to give him some not-yet-public information regarding the forthcoming news release of her

promotion to CEO of Exelon Utilities, a division of Exelon Corporation that oversees Exelon's six gas and electric utility companies.

121.    Specifically, she reported to McClain: "I needed to give you some information that is, um, as of yet, not public.  And um, I uh, am only sharing it with a few people, um, but there's going to be an announcement—and I did, um, call the Speaker this morning so he's one of the few people who's in the know—um, but there's going to be an announcement that comes out after the markets close today that I'm going to move into the CEO of Exelon Utilities as of June 1st."  Later in the call, Pramaggiore stated: "It never would have happened without you, and John, and the Speaker.  I mean hone—really.  Cause the only reason that I'm in this position is because ComEd has done so well and you guys have been my, my spirit guides [laughter] and more, on that."  As they discussed the corporate structure of Exelon and its subsidiaries, she clarified that, "But it is a promotion.  I mean, ComEd's the biggest, you know, um utility we've got and utility is the growth engine."  "I'm going to need your help in a lot of different ways."

122.    This conversation demonstrates the relationship between Exelon Utilities—which handled Exelon's six utilities, including ComEd.  The entities were closely linked, and they were also linked with Exelon Generation (Exelon's power-generation division).   Exelon was the majority owner of ComEd.  ComEd and Exelon share headquarters.  Exelon Utilities exercised oversight control over ComEd.  And officers and directors—like Pramaggiore—were routinely shuffled among the different Exelon entities.  Pramaggiore's choice of words also emphasizes her insider's perspective that these entities operated hand-in-hand such that Exelon Utilities controlled ComEd.   ("ComEd's the biggest, you know, um utility *we've* got)". (emphasis added).[13]

---

[13]  This interrelationship, and Exelon's ultimate responsibility for what went on at ComEd, are further evidenced by the fact that ComEd was subject to Exelon's Code of Conduct, which prohibited ComEd employees and agents, including third-party consultants and lobbyists, from committing bribery and included affirmative duties of payment and recordkeeping to prevent improper third-party payments.

Additionally, Exelon's Board granted authority for ComEd to enter into the Agreement. ("This Deferred Prosecution Agreement between the United States Attorney for the Northern District of Illinois, JOHN R. LAUSCH, JR. (the "government"), and defendant COMMONWEALTH EDISON COMPANY ("ComEd"), **by its undersigned representative and attorneys, pursuant to authority granted by the Board of Directors of Exelon Corporation ("Exelon")**, is made pursuant to the terms and conditions set forth below.") (emphasis added).[14]

123.    Other trial revelations similarly supported the allegations of bribery. For example, the trial emphasized the ghost contractors being funneled through McClain and Pramaggiore, including Ed Moody—who described himself on the stand as Madigan's "Number 1 Precinct Captain." Moody testified how defendants, specifically including Madigan, McClain, and Doherty, engineered a contract that Moody held for six (6) years that involved no work for ComEd. And Moody repeatedly testified that he did not think he had to do work in exchange for this money, but that instead the money was recognition from Madigan for the good work he was doing knocking on doors in the 13th Ward.

## V.    THE BOARD PURPORTS TO SETTLE PLAINTIFF'S DERIVATIVE CLAIMS

124.    On November 2, 2020, Plaintiff sent a litigation demand letter (the "Demand Letter") to the Board of Exelon. (Exhibit A)

125.    Through the Demand Letter, Plaintiff demanded that the Board take action against the officers and directors as well as individuals who participated in the fraudulent scheme to recover the damages described in the demand letter for the benefit of Exelon, including but not

---

(Exelon's Code of Conduct, effective in 2015, required employees and agents to: (a) "[k]eep accurate and complete records so all payments are honestly detailed and company funds are not used for unlawful purposes"; (b) "[c]onduct due diligence on all potential agents, consultants or other business partners"; and (c) "[n]ever use a third party to make payments or offers that could be improper."

[14] Deferred Prosecution Agreement, https://www.justice.gov/d9/press-releases/attachments/2020/07/17/co med_dpa_and_attachments_executed_0.pdf, at p. 1.

limited to, the cost of defending any possible claims and to correct the deficiencies in Exelon's controls that allowed the misconduct to occur.

126.     On April 5, 2021, counsel at Dechert LLP responded to Plaintiff's Demand Letter stating that the Committee had been formed.

127.     Plaintiff and defendants participated in mediation efforts and scheduled a mediation of Plaintiff's demand to take place in February 2023; that mediation occurred on February 17, 2023. Plaintiff in the above-captioned case participated in the mediation, but he was unable to reach an agreement.

128.     On May 26, 2023, counsel at Dechert LLP advised Plaintiff that the Committee reached a determination, and that defendants and certain other shareholders who also participated in the mediation (the "Settling Shareholders") purported to have reached a settlement resolving all derivative claims involved in this matter.

129.     Also at that time, an action was filed in this Court by the Settling Shareholders entitled *Dybas v. Exelon Corp., et al.*, No. 1:23-cv-03318 (N.D. Ill.).

130.     Plaintiff learned of this proposed settlement when the Committee filed its Notice of Determination and Intent to Seek Court Approval of Settlement on May 26, 2023.

131.     The wrongful acts complained of have harmed, and will continue to harm Exelon because the adverse consequences of the actions are still in effect and ongoing, including continued need to pay for remedial actions promised in the Agreement, continued reputational harm, etc.

     **B.     DAMAGES**

132.     Damages to the Company include: (a) a $200 million criminal penalty; (b) the costs of implementing extensive corporate governance reforms[15], as well as continued monitoring of its

---

[15] Deferred Prosecution Agreement, https://www.justice.gov/d9/press-releases/attachments/2020/07/17/comed_dpa_and_attachments_executed_0.pdf, at pp. 6–8.

compliance and ethics program,[16] such as establishing due diligence and ongoing monitoring requirements for all third parties engaged in political consulting or lobbying services and prohibitions on subcontracting of third party lobbyists and political consultants—even when such subcontracts might be the most cost-efficient choice for shareholders—among many other things, (c) extensive legal costs, including those involved in negotiating the Agreement and those included in defending civil lawsuits arising from the actions described herein, (d) extensive reputational damage for Exelon and ComEd,[17] (e) likely impairment to long-term business interests due to the appearance of impropriety in promoting any of ComEd's or Exelon's legitimate and favorable legal and regulatory interest for fear of backlash, etc.

## COUNT I

**Derivatively Against the Fiduciary Defendants' for**
**Breach of Fiduciary Duties by Failing to Conduct Oversight**

133.    Plaintiff repeats and realleges all the preceding allegations by reference as if fully set forth herein.

134.    The Fiduciary Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

135.    Each Fiduciary Defendant had a duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

136.    Despite these duties regarding management and administration of the Company, each Fiduciary Defendant violated and breached his or her fiduciary duties by failing to conduct

---

[16] Deferred Prosecution Agreement, https://www.justice.gov/d9/press-releases/attachments/2020/07/17/comed_dpa_and_attachments_executed_0.pdf, at pp. 9–10.
[17] Unfortunately, these reputational hits remain top-of-mind, creating ongoing reputational damage, because the current bribery trial of the ComEd Four only just resulted in guilty verdicts in May 2023 and now Madigan's trial is scheduled to take place in April 2024.

reasonable inquiry, oversight, and supervision and failing to maintain an adequate system of internal controls over financial reporting.

137.   The Fiduciary Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes and failed to maintain internal controls. The Fiduciary Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth (since such facts were available to them). The Fiduciary Defendants conduct set forth herein was due to their bad-faith complete failure to implement any oversight system that would have monitored and potentially caught the bribery. For example, even when there was discussion about cutting the hours of the Reyes Kurson firm to save money, the Fiduciary Defendants turned a blind eye to the problem and allowed a renegotiated contract.

138.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

139.   As a direct and proximate result of the Fiduciary Defendants' breaches of their fiduciary duties, Exelon has sustained and continues to sustain significant damages.

140.   As a result of the misconduct alleged herein, the Fiduciary Defendants are liable to the Company.

## COUNT II

**Derivatively Against the Fiduciary Defendants for Breach of Fiduciary Duties**
**by Making False and Misleading Statements and Omissions of Fact**

141.   Plaintiff repeats and realleges all the preceding allegations by reference as if fully set forth herein.

142. The Fiduciary Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

143. Each Fiduciary Defendant had a duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

144. Despite their duties, including the duty of candor, the Fiduciary Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact and material omissions alleged herein.

145. Fiduciary Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact alleged herein.

146. The Fiduciary Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and/or omitted material statements or acted with reckless disregard for the truth or in the alternative they failed to ascertain and to disclose such facts, even though such facts were available to them. Despite their actual or constructive knowledge, they failed to correct the Company's false and misleading statements and/or omissions of material facts.

147. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

148. As a direct and proximate result of the Fiduciary Defendants' breaches of their fiduciary duties, Exelon has sustained and continues to sustain significant damages.

149. As a result of the misconduct alleged herein, the Fiduciary Defendants are liable to the Company.

## COUNT III

### Derivatively Against the Fiduciary Defendants
### for Breach of Fiduciary Duty by Engaging in Illegal Conduct

150.    Plaintiff repeats and realleges all the preceding allegations by reference as if fully set forth herein.

151.    Each Fiduciary Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Exelon's business and affairs.

152.    Each of the Fiduciary Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

153.    The Fiduciary Defendants actively directed and/or actively engaged in bribery, in violation of federal bribery laws, which rises to the level of intentional breach of fiduciary duties. For example, Anne Pramaggiore—ComEd's former CEO and an executive at Exelon Utilities (in which capacity she had oversight authority over ComEd)—was recently found guilty of conspiracy, bribery, and record falsification in a federal trial.

154.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

155.    As a direct and proximate result of the Fiduciary Defendants' breaches of their fiduciary duties, Exelon has sustained and continues to sustain significant damages.

156.    As a result of the misconduct alleged herein, the Fiduciary Defendants are liable to the Company.

## COUNT IV

### Derivatively Against the Fiduciary Defendants for Waste of Corporate Assets

157.    Plaintiff repeats and realleges all the preceding allegations by reference as if fully set forth herein.

158.     Due to their failures to properly consider the interests of the Company and its public shareholders, the Fiduciary Defendants have caused Exelon to waste valuable corporate assets, incurring substantial costs related to internal investigation, defending against regulatory investigations and civil lawsuits, paying (through its subsidiary, ComEd) the $200 million criminal penalty, as well as other reputational and economic damage.  In addition, the bribery itself cost ComEd approximately $1,324,500 in payment for purported services when in reality those contracts resulted in little or no work for ComEd's benefit.

159.     As a result of this needless waste of corporate assets, the Fiduciary Defendants are each liable to the Company.

160.     These actions—springing as they do from illegal bribery—were not and could never be a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

161.     As a direct and proximate result of the Fiduciary Defendants' breaches of their fiduciary duties, Exelon has sustained and continues to sustain significant damages.

162.     As a result of the misconduct alleged herein, the Fiduciary Defendants are liable to the Company.

**COUNT V**

**Derivatively Against Certain Fiduciary Defendants for
Violation of § 14(a) of the Exchange Act**

163.     Plaintiff repeats and realleges all the preceding allegations by reference as if fully set forth herein.

164.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to § 14(a) of the Exchange Act, prohibits the solicitation of a proxy that contains "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to

any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication . . ."

165.    Certain Board Directors and Fiduciary Defendants[18] had control over the Company and caused it to disseminate false and misleading Proxy Statements on March 17, 2021 (the "2021 Proxy Statement"), on March 16, 2022 (the "2022 Proxy Statement"), and on March 15, 2023 (the "2023 Proxy Statement").

• The <u>2021 Proxy Statement</u> materially misrepresents the Company's strength of internal controls and omits facts tending to show systematic involvement in the corruption scandal alleged herein.  It claimed the misconduct was "taken by a small number of former ComEd executives[.]"  Yet, the 2021 Proxy Statement completely omits the findings of the Agreement and the allegations in subsequent indictments of the ComEd Four and Madigan indictment that exposed Exelon's inadequate internal controls by highlighting Exelon's failure to detect, *inter alia*: (a) the presence of bribes disguised as false subcontractor payments; (b) the hiring of interns who did not meet ComEd's qualifications, but instead were only retained to placate Madigan; and (c) excessive billing to Reyes and his law firm, Reyes Kursin, even when the work was not needed.  These omissions in turn rendered Exelon and ComEd's books and records inaccurate since they incorrectly presented bribery payments as purportedly legitimate business expenses.  Finally, the 2021 Proxy Statement omits any mention of the material fact that O'Neill—Exelon's Chief Legal Officer—personally knew about and approved at least some of these improper payments.

• The <u>2022 Proxy Statement</u> continues this pattern of misrepresentation.  In particular, it continues to downplay the severity of the misconduct by the Company and its agents by materially

---

[18]  The Board Directors—who were also fiduciaries—at issue in this subsection are: Anderson, Berzin, Brlas, de Balmann, DeBenedictis, Jojo, Joskow, Lawless, Mies, Rogers, Shattuck, Stenour, and/or Young.

misrepresenting the Company's strength of internal controls and omitting facts tending to show systematic involvement in the corruption scandal alleged herein. The only mention of the systemic misconduct at all was reference to an SEC subpoena seeking information relating to the conduct that led to the Agreement. It completely omits the findings of the Agreement. It completely omits the allegations in the indictments of the ComEd Four and Madigan that exposed Exelon's inadequate internal controls by highlighting Exelon's failure to detect, *inter alia*: (a) the presence of bribes disguised as false subcontractor payments; (b) the hiring of interns who did not meet ComEd's qualifications, but instead were only retained to placate Madigan; and (c) excessive billing to Reyes and his law firm, Reyes Kursin, even when the work was not needed. These omissions in turn rendered Exelon and ComEd's books and records inaccurate since they incorrectly presented bribery payments as purportedly legitimate business expenses. Finally, the 2022 Proxy Statement omits any mention of the material fact that O'Neill—Exelon's Chief Legal Officer—personally knew about and approved at least some of these improper payments.

- The 2023 Proxy Statement continues this pattern of misrepresentation. In particular, it continues to downplay the severity of the misconduct by the Company and its agents by materially misrepresenting the Company's strength of internal controls and omitting facts tending to show systematic involvement in the corruption scandal alleged herein. The only mention of the systemic misconduct at all was reference to an SEC subpoena seeking information relating to the conduct that led to the Agreement and to how the fine led to a reduction in the then-CEO Crane's compensation. It completely omits the allegations in the indictments of the ComEd Four and Madigan that exposed Exelon's inadequate internal controls by highlighting Exelon's failure to detect, *inter alia*: (a) the presence of bribes disguised as false subcontractor payments; (b) the hiring of interns who did not meet ComEd's qualifications, but instead were only retained to

placate Madigan; and (c) excessive billing to Reyes and his law firm, Reyes Kursin, even when the work was not needed. These omissions in turn rendered Exelon and ComEd's books and records inaccurate since they incorrectly presented bribery payments as purportedly legitimate business expenses. The 2023 Proxy Statement omits any mention of the material fact that O'Neill—Exelon's Chief Legal Officer—personally knew about and approved at least some of these improper payments. Finally, the 2023 Proxy Statement does not discuss Crane's role in the wrongdoing. Instead, it misleadingly paints him as a good actor—going so far as to thank him: "At the end of the year, we bid farewell to president and CEO Chris Crane. We thank him for his vision, which led to where we are today and set the new Exelon up for success."

166. As explained above, these Proxy Statements contained untrue statements of material facts. They also omitted material facts necessary to make the statements that *were* made not false and misleading in violation of § 14(a) of the Exchange Act and SEC Rule 14a-9, promulgated thereunder.

167. These false statements and omissions contributed to the continued mismanagement of Exelon and its ongoing oversight failures. Specifically, these statements and omissions formed the basis of the Company's shareholders' "say-on-pay" vote, were essential links in the re-election of each of the directors, and formed the basis of the ratification of the Company's auditor.

168. These written communications—the 2021 Proxy Statement, the 2022 Proxy Statement, and the 2023 Proxy Statement—constitute violations of Rule 14a-9 and § 14(a) because such communications were materially false and/or misleading and were provided in a negligent, reckless, or fraudulent manner.

169.    At all relevant times to the dissemination of the materially false and/or misleading Proxy Statements, these certain Board Directors and Fiduciary Defendants[19] were aware of, and/or had access to, the facts concerning Exelon and ComEd's misconduct.

170.    As a result, Exelon has been injured by this conduct and is entitled to damages and equitable relief.

**COUNT VI**

**Derivatively Against Certain Fiduciary Defendants for
Violation of § 29(b) of the Exchange Act**

171.    Plaintiff repeats and realleges all the preceding allegations by reference as if fully set forth herein.

172.    Certain Board Directors and Fiduciary Defendants each received incentive compensation and fees, including stock awards, while engaged in conduct that violated § 14(a) of the Exchange Act.

173.    This same conduct also inured to the benefit of the Certain Board Directors and Fiduciary Defendants.  Contracts made in violation of § 14(a) of the Exchange Act are subject to recission under § 29(b) of the Exchange Act.  15 USCS § 78cc.  Thus, all the payments these certain Board Directors and Fiduciary Defendants received are therefore voidable by Exelon under § 29(b) of the Exchange Act.

174.    As such, their incentive compensation and fees should be rescinded under § 29 of the Exchange Act because these Defendants violated § 14(a) by issuing false and misleading reports to Exelon shareholders regarding the nature of, and responsibility for, violations of federal law and regulations.

---

[19]   The Board Directors—who were also fiduciaries—at issue in this subsection are: Anderson, Berzin, Brlas, de Balmann, DeBenedictis, Jojo, Joskow, Lawless, Mies, Rogers, Shattuck, Stenour, and/or Young.

## COUNT VII

### Derivatively Against Third-Party Defendants for Aiding and Abetting Breach of Fiduciary Duty

175.    Plaintiff repeats and realleges all the preceding allegations by reference as if fully set forth herein.

176.    The Third-Party Defendants were sophisticated actors with a deep understanding of the laws and the legal and legislative systems—for example, Madigan was the Speaker of the Illinois House of Representatives for 36 years; McClain was former state lawmaker; Reyes was a lawyer, etc.

177.    Yet, the Third-Party Defendants repeatedly chose to engage in and directed the bribery scheme, in violation of federal bribery statutes. They directed ComEd and Exelon officers and directors to engage in bribery. For example, on or about January 20, 2016, when the Reyes Kurson contract was up for renegotiation, McClain contacted Pramaggiore, telling her that she knew how valuable Reyes was to Madigan and then went on to write, "I know the drill and so do you. If you do not get involved [sic] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend [Madigan]. Our Friend [Madigan] will call me and then I will call you. Is this a drill we must go through?" Pramaggiore replied in writing, "Sorry. No one informed me. I am on this."

178.    As a result of their actions, the Third-Party Defendants intentionally and substantially participated in causing Exelon and ComEd Fiduciary Defendants in breaching their fiduciary duties, and, therefore, were aiding and abetting these breaches of fiduciary duties.

179.    As a direct and proximate result of the Third-Party Defendants aiding and abetting breaches of the Fiduciary Defendants' fiduciary duties, Exelon has sustained, and continues to sustain, significant damages.

180.     As a result of the misconduct alleged herein, the Third-Party Defendants are liable to the Company.

## COUNT VIII

**Derivatively Against Fiduciary and Third-Party Defendants for Unjust Enrichment**

181.     Plaintiff repeats and realleges all the preceding allegations by reference as if fully set forth herein.

182.     By their wrongful acts, the Fiduciary and Third-Party Defendants were together unjustly enriched at the expense of, and to the detriment of, Exelon.

183.     Specifically, they either benefitted financially from the improper conduct, including through insider sales, or received bonuses, stock options, or other similar compensation from Exelon as a result of their bribery or received compensation that was unjust in light of their bad faith conduct, including accepting or directing bribes.

184.     Plaintiff—a shareholder and representative of Exelon—seeks restitution from the Defendants for their ill-gotten gains and asks this Court to issue an order disgorging all profits, including from insider transactions, benefits, and other compensation (including any both performance-based and valuation-based compensation) obtained by the Defendants due to their wrongful conduct.

## JURY DEMAND

185.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following judgment and relief:

186.    A declaration that Plaintiff is an adequate representative of the Company and thus that he may maintain this action on the Company's behalf;

187.    A declaration that the Fiduciary Defendants have breached their fiduciary duties to the Company;

188.    An order that the Fiduciary and Third-Party Defendants are jointly and severally liable and must account for all losses and/or damage sustained by the Company by reason of the acts and omissions complained of herein, together with pre-judgment and post-judgment interest;

189.    An award of restitution from each of the Fiduciary and Third-Party Defendants to the Company;

190.    An award to Plaintiff of his attorneys' fees, expert fees, and other costs and expenses associated with this action; and

191.    Such other and further relief as the Court may deem just and proper.

Dated:  June 29, 2023                     Respectfully submitted,


                              By:    *s/  Daniel O. Herrera*
                                     Daniel O. Herrera
                                     **Cafferty Clobes Meriwether & Sprengel LLP**
                                     135 South LaSalle Street, Suite 3210
                                     Chicago, Illinois  60603
                                     (312) 782-4480
                                     dherrera@caffertyclobes.com

                                     *Local Counsel for Plaintiff*

                                     Lawrence Eagel
                                     Brandon Walker
                                     **Bragar Eagel & Squire, P.C.**
                                     810 Seventh Ave., Suite 620
                                     New York, New York  10019
                                     (212) 308-5888

                                     *Lead Counsel for Plaintiff*

## VERIFICATION TO SHAREHOLDER DERIVATIVE COMPLAINT

I, <u>Melvin Peller</u>, declare and verify that I am a shareholder of Exelon Corporation and have been during the relevant time period as alleged in the attached Complaint. I certify under penalty of perjury that I have read and reviewed the Verified Derivative Complaint, and I authorize its filing on my behalf. I further verify that as to the allegations in the Verified Derivative Complaint of which I have personal knowledge, I believe those allegations to be true to the best of my knowledge, information, and belief. As to the allegations in the Verified Derivative Complaint of which I do not have personal knowledge, I believe those allegations to be true based upon my and my counsel's investigation and based on the discussions with and reliance upon my counsel and to the best of my knowledge, information, and belief.

I have not received, been promised or offered, and will not accept any form of direct or indirect compensation for prosecuting this action or serving as a representative party in this action except as follows: (1) such fees, costs, or other payments the Court expressly approves to be paid to me; and/or (ii) reimbursement, by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this matter.

I declare the above is true and correct under penalty of perjury.


Date: June 28, 2023


Melvin Peller